# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                                      )
JAMES FALVEY,                                         )
                          Plaintiff,                  )
                                                      )
          v.                                          )          Civil Action No. 23-13193-MJJ
                                                      )
UNITED STATES FIRE INSURANCE                          )
COMPANY, CRUM & FORSTER                               )
HOLDINGS) CORP.                                       )
(dba CRUM & FORSTER CORP.), and                       )
BLUE STAR CLAIMS LLC,                                 )
                          Defendants.                 )
_____)

## <u>MEMORANDUM OF DECISION</u>

June 10, 2025

JOUN, D.J.

      This case arises out of a dispute between the Plaintiff James Falvey ("Mr. Falvey"), and Defendants United States Fire Insurance Company ("U.S. Fire"), Crum & Forster Holdings Corporation d/b/a/ Crum & Forster Corporation, and Blue Star Claims, LLC ("Blue Star") regarding Mr. Falvey's insurance claims for injuries he suffered from a traffic accident that occurred while Mr. Falvey was driving for DoorDash in Florida. [*See* Doc. No. 1-1]. Before me is U.S. Fire and Blue Star's Motion for Partial Judgment on the Pleadings. [Doc. No. 51]. Defendants move for judgment as to 18 of the 26 counts alleged in Mr. Falvey's complaint. [*Id.*]. For the reasons stated below, Defendants' Motion is <u>DENIED</u> as to Counts 1-4, 7, 9-10, 12-13. Defendants' Motion is <u>GRANTED</u> as to Counts 8, 11, 17-19, 21, 24-26, and those claims are hereby dismissed. In a previous order, I held that discovery shall be stayed pending my resolution of Defendants' Motion. [Doc. No. 58]. Discovery may now commence as to the remaining counts.

## I.       FACTUAL BACKGROUND

On March 2, 2022, Mr. Falvey suffered extensive injury following an accident that took place while he was employed as an independent contractor for DoorDash. [Doc. No. 1-1 at ¶ 12; *see also* Doc. No. 52 at 7]. Mr. Falvey's injuries include head trauma, jaw fracture, face lacerations and disfigurement, spinal injuries, hand and finger injuries, knee trauma, mental anguish, emotional trauma, suffering, and loss of quality of life, among other extensive injuries. [Doc. No. 1-1 at ¶ 12]. At the time of the accident, Mr. Falvey was insured under a Blanket Occupational Accident Certificate of Insurance ("the Policy" or "the Certificate") pursuant to a master policy issued to DoorDash by U.S. Fire that is administered by Blue Star. [Doc. No. 1-1 at ¶ 13; *see also* Doc. No. 24-1; Doc. No. 52 at 7].[1] On March 14, 2022, Mr. Falvey opened an insurance claim for his medical expenses relating to the accident. [Doc. No. 1-1 at ¶ 13].

### A.      <u>The Policy</u>

Under the Policy, U.S. Fire is referred to as "We," "Our," Or "Us". [Doc. No. 24-1 at 2]. The Policy's opening paragraph states that "We will pay the benefits described in this Certificate to a Covered Person for certain losses resulting directly and independently of all other causes from an Injury sustained in an Occupational Accident that occurs while this Certificate is in force and coverage under the Master Group Policy is in effect. Coverage is subject to all the provisions, conditions, exclusions and limitations described in this Certificate." The Certificate is not workers' compensation insurance and does not cover sickness or any other type of injury other than an occupational accident. [*Id.*]. The Policy provides three types of benefits. The relevant type of benefits at issue here are the "Accident Medical/Dental Expense Benefits," which provide a maximum benefit of $1,000,000 per occupational accident, and treatment must

---

[1] Mr. Falvey's group insurance policy number is US1515385, which became effective July 1, 2021. [Doc. No. 24-1 at 4].

begin within 90 days from the date of an injury, with a maximum payment period of 104 weeks from the date of the injury. [*Id.* at 5; Doc. No. 1-1 at ¶ 15].

Under the Policy, the Accident Medical/Dental Expense benefits provide payment for "Covered Expenses" that are "charged to" the insured "while covered." [Doc. No. 24-1 at 15]. Covered Expenses are the "actual cost to [the insured] of the Reasonable Charges for the services and supplies"[2] that must be "Ordered by a Physician as Medically Necessary for Injuries that result directly . . . from an Occupational Accident." [*Id.*]. Covered Expenses include ambulance services, healthcare provider services, hospital charges, laboratory tests and x-rays, medical supplies, occupational therapy, and more. [*Id.* at 15-17]. Coverage under the Policy is limited by the benefit-specific exclusions and general exclusions contained in the policy. [*See id.* at 18-20]. Among the various exclusions listed in the Policy, there is a general exclusion that provides that the Policy "does not cover any loss . . . [t]hat is psychological or emotional in nature, including pain and suffering, that is not a direct result of an Occupational Accident." [*Id.* at 19–20].

To submit a claim, written notice must be provided to U.S. Fire within 20 days after the occurrence of the loss covered by the Certificate. [*Id.* at 21]. Upon receipt of the notice, U.S. Fire "will furnish to the Covered Person such forms as are usually furnished by [U.S. Fire] for filing proofs of loss." [*Id.* at 22]. If the insured does not receive such forms within 15 days, their claim is deemed to have complied with the Certificate upon submitting "written proof covering the occurrence, the character and the extent of the loss for which claim is made." [*Id.*]. "Indemnities payable under this Certificate for any loss . . . will be paid as they accrue immediately upon

---

[2] "Reasonable Charges" are defined as "[a]n amount measured and determined by Us by comparing the actual charge for the service or supply with the prevailing charges made for it. It takes into account all pertinent factors including" among other things, the complexity of the service, the range of services provided, the prevailing charge levels in the geographic area where the provider is located and other areas with similar medical cost experience. [Doc. No. 24-1 at 9].

receipt of due written proof of such loss." [*Id.*]. The Policy provides that the insurer has the option to pay any indemnities provided by the Certificate, "on account of hospital, nursing, medical or surgical service . . . directly to the Hospital or person rendering such services, but it is not required that the service be rendered by a particular Hospital or person." [*Id.*].

The Policy also provides for grievance procedures. When U.S. Fire denies a claim, it will provide a written statement containing the reasons for the "Adverse Determination." [*Id.* at 24]. The informal and formal grievance procedures outlined in the Policy provide the insured with a mechanism to appeal any adverse claim determination. [*Id.*].

### B.    **Mr. Falvey's Communications with Defendants**[3]

#### i.    **Mr. Falvey's Attempts to Receive a Recommended Provider List and Approval for Hand Surgery**

On March 15, 2022, Mr. Falvey had two phone calls with the claims adjuster for U.S. Fire at Blue Star. [Doc. No. 1-1 at ¶¶ 14, 19]. Mr. Falvey conveyed his need for treatment and coverage for that treatment, and was advised that due to his disabling injuries, he could ask medical providers if "Blue Star" or "Occupational Accident Insurance" is accepted. [*Id.* at ¶ 19]. Otherwise, Mr. Falvey was advised that he could pay out of pocket and seek reimbursement later. [*Id.*]. Defendants did not provide Mr. Falvey with a "Recommended Provider List" at this time. [*Id.*]. Mr. Falvey alleges that had he received the Recommended Provider List, he could have gone to one of those providers and not have been required to pay out of pocket for his treatment and would have avoided the "unnecessary pain inflicted aimlessly searching" due to his disability. [*Id.* at ¶ 20].

---

[3] This factual background is limited to facts that are relevant to the claims upon which Defendants move for judgment on the pleadings.

On March 23, 2022, after calling Blue Star several times without receiving an answer, Mr. Falvey informed the adjuster that he was unable to find treatment providers who accept Blue Star or Occupational Accident Insurance, and was advised that he could continue his search or schedule a self-pay appointment and request reimbursement later. [*Id.* at ¶¶ 21–22]. The adjuster did not provide Mr. Falvey with a Recommended Provider List at this time. [*Id.* at ¶ 22]. On April 14, 2022, Mr. Falvey again called the adjuster two times, but his call was not returned, and no recommended provider list was provided. [*Id.* at ¶ 23]. Mr. Falvey alleges that by being directed to self-pay, he must take on the financial burden and thus "has less for treatment and living with disability." [*Id.* at ¶ 26]. He further alleges that by being directed to self-pay, he must provide Defendants "with additional documents for reimbursement which forces disabled [Plaintiff] to perform additional steps and delays before the Defendants issue payment from the policy." [*Id.* at ¶ 27]. Plaintiff alleges that these "additional steps, paperwork, delays and misrepresentations of the policy are intentional efforts to cause [Plaintiff] financial loss/lapse of the policy." [*Id.* at ¶ 28].

On April 28, 2022, Mr. Falvey spoke with the adjuster, reiterating his urgent need for a hand surgeon and his difficulty in finding a provider who accepts his insurance. [*Id.* at ¶ 32]. During that call, Mr. Falvey and the adjuster made a plan to schedule a self-pay appointment with a hand surgeon "as a placeholder" and the adjuster "was to communicate with the provider to establish a working relationship and approve treatment." [*Id.* at ¶ 33]. On April 29, 2022, Mr. Falvey followed up with an email to the adjuster: "I had a self-pay appointment scheduled for 5/5/2022 regarding my right hand/fingers. I provided them your contact information as discussed and they reached back requesting you call them." [*Id.* at ¶ 34]. After receiving no further communication from the adjuster following this email, Mr. Falvey called the adjuster on May 3, 2022, and was unable to reach them, and also sent an email reminder. [*Id.* at ¶ 35]. On May 5,

2022, Mr. Falvey went to his hand surgeon appointment only to find that it had been canceled due to inaction from the adjuster. [*Id.* at ¶ 36]. On May 10, 2022, the adjuster emailed Mr. Falvey stating they will call the hand surgeon. [*Id.* at ¶ 37]. No appointment was booked with the treatment provider by the adjuster. [*Id.* at ¶ 38]. Mr. Falvey alleges his belief that the adjuster wanted Mr. Falvey to show up to the appointment so that he would have to self-pay such that Defendants did not have to issue the Policy's benefits, "causing additional steps in an effort to induce the lapse of policy." [*Id.* at ¶ 39].

On May 6, 2022, Mr. Falvey scheduled an appointment from the recommended provider list for that same day, where the treating physician identified a need for a hand surgeon. [*Id.* at ¶¶ 48–49].[4] On May 9, 2022, the recommended provider emailed the adjuster, referring Mr. Falvey to a hand surgeon and requesting authorization from the adjuster to schedule the hand surgery appointment. [*Id.* at ¶ 50]. The recommended provider also stated that they "will provide appointment details within 24 hours of determination." [*Id.*]. At his next appointment with the recommended provider on May 11, 2022, doctors were concerned that Mr. Falvey had not yet seen a hand surgeon. [*Id.* at ¶ 51]. Mr. Falvey alleges that he had not seen a hand surgeon because the adjuster failed to approve or schedule the appointment, and doctors advised Mr. Falvey to reach back out to the adjuster. [*Id.* at ¶¶ 52–53].

This commenced a round of back-and-forth calls between Mr. Falvey, the adjuster, and the recommended provider; the adjuster would tell Mr. Falvey that Defendants do not direct treatment and that the recommended provider would need to schedule the appointment, and the recommended provider would respond that the adjuster had to approve treatment before scheduling it. [*Id.* at ¶¶ 54–57]. Mr. Falvey was eventually able to hold a group call with the

---

[4] It is unclear from the pleadings when or how Mr. Falvey received a recommended provider list.

adjuster and the recommended provider on May 11, 2022, where the adjuster admitted that they should have approved or scheduled the appointment, and provided that approval. [*Id.* at ¶¶ 57–58]. Mr. Falvey alleges that the adjuster demonstrated bad faith by failing to promptly approve treatment and deceiving Mr. Falvey into believing it was not the adjuster's responsibility to do so. [*Id.* at ¶ 64].

On May 12, 2022, the adjuster approved the appointment, which was booked for May 25, 2022. [*Id.* at ¶ 69]. Mr. Falvey instead booked an appointment for May 19, 2022, as he was concerned that the delays in getting treatment would cause negative health repercussions. [*Id.* at ¶ 70]. Mr. Falvey emailed Blue Star asking for confirmation that he would be fully reimbursed if he scheduled an earlier appointment on his own and paid out of pocket. [*Id.*]. The adjuster did not confirm or deny whether Mr. Falvey would be reimbursed. [*Id.* at ¶ 71].[5]

### ii.  **Mr. Falvey's First Settlement Demand & Settlement Negotiations**

On June 20, 2022, Mr. Falvey was still struggling to obtain medical treatment under the Policy. [*Id.* at ¶ 76]. To get treatment, Mr. Falvey attempted to settle with Defendants and sent a demand letter seeking:

> INCURRED MEDICAL TREATMENT: $47,071.49
> FUTURE MEDICAL TREATMENT: $52,858.95
> PAIN AND SUFFERING: $530,621.63
> TOTAL: $630,552.08

[*Id.*]. The demand letter was provided with medical records and billing ledgers, which Plaintiff alleges is "written proof" of loss. [*Id.*]. On July 8, 2022, Blue Star responded with their own offer:

> 1. You need to be at MMI before we settle.
> 2. You would no longer be able to DoorDash as part of the agreement.
> 3. We ask that you have an attorney review the settlement terms before agreeing.

---

[5] It is unclear from the pleadings whether Mr. Falvey ever eventually received hand surgery and if so, whether he went to a recommended provider or paid out of pocket.

4. Settlement Amount: **$21,500.92**
    a. TTD 6 weeks: 1300.92
    b. Hand Specialist: 6500.00
    c. Diagnostics:; 1200.00
    d. 6 wks PT: 2400.00
    e. Dispute on psych: 1500.00
    f. Dental: 3000.00 (This number is based on dentures rather than implants. We would require a medical necessity review for implants since those are not always medically necessary.)
    g. Concussion: 2500.00 (possible dispute since not mentioned in early treatment notes)
    h. Nuisance: 3000.00
    i. 100.00 to terminate contract with DD

[*Id.* at ¶ 78]. On a phone call on July 12, 2022, Mr. Falvey responded to Blue Star's offer by lowering his initial demand by $5,000. [*Id.* at ¶ 87]. The vice president of claims, a woman by the name of Shelley, verbally retracted Blue Star's offer of $21,500. [*Id.*]. After that call, Mr. Falvey emailed Blue Star recounting his discussions with Shelley, confirming that Shelley verbally stated that Blue Star "will pay for [Plaintiff's] medical treatment" and that Plaintiff is "able to go to the medical providers" he chooses. [*Id.* at ¶ 88]. Mr. Falvey also requested reimbursement for $47,306.49 in expenses he had already incurred from his accident. [*Id.*]. On July 19, 2022, Defendants responded and did not reimburse Mr. Falvey, but instead stated: "We have received your original demand of $630,552.08 and your updated demand of $625,552.08 dated 7/8/2022. We respectfully decline." [*Id.* at ¶ 89]. Mr. Falvey continued treatment at his own expense. [*Id.* at ¶ 90]. Mr. Falvey alleges that he was reimbursed $133 on March 17, 2023, and was reimbursed $133 on November 4, 2023. [*Id.* at ¶¶ 91, 160].

### iii. **Mr. Falvey's Second Settlement Demand & Settlement Negotiations**

On August 7, 2023, Mr. Falvey sent another demand letter, seeking:

INCURRED MEDICAL TREATMENT: $49,847.58
FUTURE MEDICAL TREATMENT: $71,358.95
PAIN AND SUFFERING: $583,811.86
TOTAL: $705,018.39

[*Id.* at ¶ 98]. On August 18, 2023, Defendants sent a "Response To Insurance Payment Demand" letter stating: "A demand is made for benefits relating to 'pain and suffering'. As noted above, the Policy at issue is an accident only policy. We are not an auto policy and do not offer UM/UIM coverage." [*Id.* at ¶ 99]. Mr. Falvey alleges that "pain and suffering" is included in the policy, and that multiple adjusters and managers confirmed that pain and suffering is covered. [*Id.* at ¶ 101]. For example, Mr. Falvey alleges that Jason Shultz, Vice President of Operations at Blue Star, stated in an email dated August 21, 2023, that "Pain and suffering is covered under the policy." [*Id.*]. The August 18th response from Blue Star also denied Mr. Falvey's second demand for expenses related to future medical treatment: "Since the Policy only pays for covered charges which are medically necessary, we cannot reimburse or pay for future medical care." [*Id.* at ¶ 106]. Mr. Falvey alleges that the carrier's own non-treatment independent medical evaluation conducted on September 21, 2022, demonstrates that his treatment plan was directly related to the accident and was medically necessary. [*Id.* at ¶ 108].

In response to the August 18th letter, Mr. Falvey asked what the next steps may be to reach a resolution. [*Id.* at ¶ 114]. Mr. Falvey received a response on August 28, 2023, directing him to "litigate the matter in court." [*Id.*]. Mr. Falvey then asked about the Policy's grievance procedures, and was told those procedures do not apply. [*Id.* at ¶ 123]. Regardless, Mr. Falvey sent a grievance via certified mail that was delivered on October 13, 2023. [*Id.* at ¶ 132]. Mr. Falvey did not receive contact information for the grievance coordinator as stated under the grievance procedures. [*Id.* at ¶¶ 133-134]. Mr. Falvey also attempted to call the phone number listed in the "informal grievance procedure" section of the Policy but found that the number was inactive. [*Id.* at ¶¶ 138-143; Doc. No. 24-1 at 24]. Mr. Falvey sent multiple emails asking for updated contact information to no avail. [*Id.*].

### iv. **Mr. Falvey's Third Settlement Demand**

On September 25, 2023, Mr. Falvey sent a demand letter seeking $902,102.03 in settlement costs. [*Id.* at ¶¶ 207, 209]. On October 24, 2023, Defendants responded with an offer of $85,996.46, along with a spreadsheet of "medical and indemnity payments under the Policy." [*Id.* at ¶¶ 209, 216]. The spreadsheet shows that $2,932.48 in medical treatment had been paid from the policy, and $3,613.25 in non-treatment expenses had been paid from the policy. [*Id.* at [*Id.* at ¶¶ 216–219]. Mr. Falvey alleges that because Defendants "allocated more" on non-medical treatment expenses than on "actual treatment," and because no records of the non-treatment expenses were provided to Mr. Falvey prior to his demand letters, his "demands for Pain and Suffering were understated and offers received were unreasonably low." [*Id.* at ¶¶ 220–223].

## II.    PROCEDURAL HISTORY

On November 17, 2023, Mr. Falvey commenced this action by filing a Complaint in the Suffolk County Superior Court. [Doc. No. 1 at ¶ 1; Doc. No. 1-1]. Defendants removed the action to this court on December 26, 2023. [Doc. No. 1]. Mr. Falvey brings 26 counts against Defendants, primarily alleging violations of M.G.L. c. 93A, § 2(a) and M.G.L. c. 176D, § 3, as well as breach of contract and negligence claims. [Doc. No. 1-1]. On November 25, 2024, Defendants moved for judgment on the pleadings as to 18 of the 26 counts alleged in the complaint. [Doc. Nos. 51, 52]. On December 2, 2024, Plaintiff filed an Opposition. [Doc. No. 53]. Discovery has been stayed pending resolution of the instant motion. [Doc. No. 58].

## III.    LEGAL STANDARD

Under Rule 12(c) of the Federal Rule of Civil Procedure, "a party may move for judgment on the pleadings." "The standard of review of a motion for judgment on the pleadings

under Federal Rule of Civil Procedure 12(c) is the same as that for a motion to dismiss under Rule 12(b)(6)." *Marrero-Gutierrez v. Molina*, 491 F.3d 1, 5 (1st Cir. 2007). However, "[a] Rule 12(c) motion, unlike a Rule 12(b)(6) motion, implicates the pleadings as a whole." *Aponte-Torres v. Univ. Of Puerto Rico*, 445 F.3d 50, 54–55 (1st Cir. 2006). "Dismissal is only appropriate if the pleadings, so viewed, fail to support a 'plausible entitlement to relief.'" *Kimmel & Silverman, P.C. v. Porro*, 969 F. Supp. 2d 46, 49–50 (D. Mass. 2013) (quoting *Rodriguez–Ortiz v. Margo Caribe, Inc.,* 490 F.3d 92, 95 (1st Cir. 2007)). "A claim has facial plausibility 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Taylor v. Milford Reg'l Med. Ctr., Inc.*, 733 F. Supp. 3d 8, 13 (D. Mass. 2024) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. "In reviewing a 12(c) motion, the court must 'separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" *Taylor*, 733 F. Supp. 3d at 13 (quoting *Guadalupe-Báez v. Pesquera*, 819 F.3d 509, 514 (1st Cir. 2016)).

A court must "view the facts contained in the pleadings in the light most favorable to the nonmovant and draw all reasonable inferences in his favor." *Zipperer v. Raytheon Co.*, 493 F.3d 50, 53 (1st Cir. 2007). Moreover, "the fact that the plaintiff filed the complaint pro se militates in favor of a liberal reading." *Rodi v. S. New England Sch. Of L.*, 389 F.3d 5, 13 (1st Cir. 2004) ("[o]ur task is not to decide whether the plaintiff ultimately will prevail but, rather, whether he is entitled to undertake discovery in furtherance of the pleaded claim"); *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (the "allegations of the pro se complaint" are held "to less stringent standards

than formal pleadings drafted by lawyers"). "The court may supplement the facts contained in the pleadings by considering documents fairly incorporated therein and facts susceptible to judicial notice." *Curran v. Cousins*, 509 F.3d 36, 44 (1st Cir. 2007) (citation omitted); *see also id.* at 45 ("In reviewing a motion under Rule 12(c), as in reviewing a Rule 12(b)(6) motion, we may consider documents the authenticity of which are not disputed by the parties; documents central to plaintiffs' claim; and documents sufficiently referred to in the complaint") (citation omitted).

## IV.     ANALYSIS

The Complaint primarily alleges violations of M.G.L. c. 93A, § 2(a) ("Chapter 93A") and M.G.L. c. 176D, § 3 ("Chapter 176D"). Chapter 176D, § 3 defines "unfair methods of competition and unfair or deceptive acts or practices in the business of insurance" as including, among other things, "unfair claim settlement practices." M.G.L. c. 176D, § 3(1), (9). Chapter 93A generally outlaws "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." M.G.L. c. 93A, § 2(a). Chapter 176D itself does not provide a private cause of action. Rather, "any person injured by another's acts declared unlawful under 176D, § 3(9) may bring an action for damages and/or equitable relief under chapter 93A, § 9." *Amarante v. Aetna Cas. & Sur. Co.*, No. 87-cv-1732, 1988 WL 96601, at *3 (D. Mass. Sept. 6, 1988), *aff'd,* 879 F.2d 852 (1st Cir. 1989); *see also Morin v. Metro. Prop. & Cas. Ins. Co.*, No. 16-10687, 2016 WL 9053346, at *2 (D. Mass. June 7, 2016) (cleaned up) ("Chapter 176D does not provide a separate private cause of action. A Chapter 93A violation, however, can arise from violations of Chapter 176D"). Chapter 93A, § 9(1) in turn provides a private cause of action for "any person whose rights are affected by another person violating the

provisions of clause (9) of section three of chapter one hundred and seventy-six D." M.G.L. c. 93A, § 9(1).[6]

Chapter 176D § 3(9) lists several acts or omissions that constitute unfair claim settlement practices. To state a claim under Chapter 93A for a violation of Chapter 176D, Plaintiff must allege that "(1) an unfair or deceptive act or practice has been committed; and (2) that the commission of that act or practice has caused [him] an injury within the meaning of Chapter 93A, § 9(1)." *Costa v. Zurich Am. Ins. Co.*, No. 23-cv-11594, 2024 WL 1093002, at *5 (D. Mass. Mar. 13, 2024) (citation omitted). "Recovery under Chapter 93A for a violation of Chapter 176D, § 3(9), is unlikely when an insurance company in good faith denies a claim of coverage on the basis of a plausible interpretation of its insurance policy." *Merullo v. Amica Mut. Insuance Co.*, No. 22-cv-10410, 2022 WL 17417717, at *4 (D. Mass. Dec. 5, 2022), *aff'd sub nom. Merullo v. Amica Mut. Ins. Co.*, No. 23-1005, 2023 WL 6143218 (1st Cir. Sept. 20, 2023) (cleaned up) (citation omitted).

### A.    Counts 1-4: Failure to Provide Recommended Provider List and to Approve Treatment

Counts 1-4 allege violations of Chapter 176D § 3(9), arising from Plaintiff's communications with Blue Star's adjuster from March to May 2022, when he was trying to receive a recommended provider list and approval for his hand surgery. Defendants argue that Counts 1-4 should be dismissed because Plaintiff was not entitled to a provider list or pre-approval under the Policy, specifically because the Policy is not "managed care" such that

---

[6] Counts 11, 17, and 18 allege violations of Chapter 176D, § 3(1), (2), and (10), for which there is no private cause of action, and Counts 1-3, 5-8, 12-18, 21-22, assert claims under those clauses in addition to claims under § 3(9), for which there is a private cause of action. As explained below, Counts 11, 17, and 18 are dismissed because they are premised on clauses for which there is no private cause of action, and I will only focus my analysis on the remaining claims to the extent they are premised on violations of § 3(9).

Plaintiff would have to find a medical professional that would accept Blue Star payments directly. [*See* Doc. No. 52 at 14-15]. But Plaintiff's claims are not premised on whether Defendants had a duty under the Policy to give him a recommended provider list or to pre-authorize his surgery. Indeed, "claims for coverage and claims for violations of Chapter 93A offer distinct avenues for relief." *Costa*, 2024 WL 1093002, at *6 (citation omitted). Chapter 93A "allow[s] a plaintiff to remedy the separate harm caused by the insurer's unfair settlement practices." *Id.* (citation omitted). Here, Plaintiff makes plausible allegations that Defendants, in bad faith, delayed his treatment by making misrepresentations regarding the process for scheduling treatment, misleading him into believing that he needed pre-authorization, and failing to respond to Plaintiff promptly regarding his coverage, as prohibited by various clauses of Chapter 176D § 3(9).

Plaintiff has alleged that the Recommended Provider List was withheld from him for 58 days from the date of his injury, [Doc. No. 1-1 at ¶¶ 18], that his treatment was consistently delayed by the adjuster, and that he was given mixed messages—or in some cases, no messages at all—regarding scheduling and coverage. Even if Defendants had no duty to provide a recommended provider list under the Policy, Defendants do not contest the existence of such a list, fail to explain why it was not provided upon numerous calls and requests from Plaintiff, and fail to explain why, if there was such a list, the adjuster instead directed Plaintiff to self-pay and indicated to Plaintiff that they would work with him to schedule a self-pay appointment and "communicate with the provider to establish a working relationship and approve treatment," but never did. [*Id.* at ¶ 33]. These factual allegations raise a plausible inference that Defendants' misrepresentations and then subsequent silence were made in bad faith in order to delay Plaintiff's treatment.

Further, I agree with Plaintiff's argument that "if the policy does not allow pre-approval, then the Defense misrepresented the policy by pre-approving treatment and indicating to the Plaintiff that they could pre-approve treatment." [Doc. No. 53 at 3]. Based on his allegations, Plaintiff was getting the runaround from Defendants; he was told by the adjuster that he needed approval, [Doc. No. 1-1 at ¶ 33], then told by the adjuster that they do not "direct treatment," [*id.* at ¶ 54], and then told by the adjuster that the adjuster "should have approved/scheduled the appointment," and ultimately did provide that approval, [*id.* at ¶ 58]. Plaintiff was also directed to schedule a self-pay appointment as a placeholder based on a false assurance that he would be pre-approved. [Doc. No. 53 at 3]. These back-and-forth communications caused his treatment to be delayed for too long, causing Plaintiff to book a self-pay appointment without receiving confirmation from the adjuster as to whether he would be covered. [Doc. No. 1-1 at ¶¶ 69–72].

I find plausible that Defendants "[m]isrepresent[ed] pertinent facts or insurance policy provisions relating to coverages at issue," by misleading Plaintiff into believing that the adjuster would approve treatment, and "[f]ailing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies." I also find plausible Defendants misrepresented pertinent facts or insurance policy provisions by failing to do the following: provide Plaintiff with a recommended provider list, communicate promptly with the recommended provider as assured to Plaintiff, and answer Plaintiff's questions regarding his coverage. M.G.L. c. 176D § 3(9)(a), (b). Thus, Defendants' Motion as to Counts 1-4 is denied.

**B.**     **Counts 7-8: Denial Of Claims for Pain & Suffering, Future Medical Expenses**

Counts 7 and 8 arise from Defendants' denial of Plaintiff's second settlement demand, in which Plaintiff sought expenses for incurred medical treatment, future medical treatment, and pain and suffering. [*Id.* at ¶¶ 97–111]. Defendants argue that Count 7 should be dismissed

because pain and suffering is not covered under the Policy. I disagree. The Policy states that it "does not cover any loss . . . [t]hat is psychological or emotional in nature, including pain and suffering, *that is not a direct result of an Occupational Accident*." [Doc. No. 24-1 at 19–20 (emphasis added)]. Plaintiff alleges that he suffered mental anguish, anxiety, depression, emotional trauma, grief, loss of quality of life, and mental suffering from his occupational accident. [Doc. No. 1-1 at ¶ 12]. Defendants do not argue that Plaintiff's second demand seeks pain and suffering expenses for losses unrelated to his occupational accident. Thus, construing the facts in the light most favorable to Plaintiff and assuming Plaintiff's demand included expenses for pain and suffering resulting from his accident, then pain and suffering would be covered under the Policy. [Doc. No. 24-1 at 19–20]. Additionally, Plaintiff alleges that Defendants led him to believe that pain and suffering was covered. [*See* Doc. No. 1-1 at ¶ 101 ("Pain and suffering is covered under the policy")]. This is sufficient to give rise to a plausible claim that Defendants "[m]isrepresent[ed] pertinent facts" relating to coverage. M.G.L. c. 176D § 3(9)(a). Thus, Defendants' Motion as to Count 7 is denied.

As to Count 8 regarding Plaintiff's demand for future medical expenses, the Policy states that reimbursable "covered expenses" are expenses that "must be charged to You [Plaintiff] while covered," and thus would not include future medical expenses not yet incurred. [Doc. No. 24-1 at 15]. Plaintiff has not pled any facts that could lead to an inference that Defendants made any misrepresentations in connection with their denial of Plaintiff's demand for future medical expenses. Accordingly, Defendants' Motion as to Count 8 is granted.

### C.    Counts 9-13: Denial of Grievance Procedures

Counts 9-13 are based on Defendants' failure to direct Plaintiff to utilize the grievance procedures outlined in the Policy. [*See* Doc. No. 24-1 at 24–26]. Under the Policy, when the

insured submits a claim and the claim is denied, the insurer will provide a "written statement containing the reasons for the Adverse Determination." [*Id.* at 24]. An "adverse determination" is defined in the Policy as a determination that "a service, treatment . . . is experimental, investigational, specifically limited or excluded by" the insured's coverage, or that the "health care services proposed or furnished have been reviewed and, based upon the information provided, does not meet the contractual requirements for medical necessity, appropriateness, health care setting, level of care or effectiveness and therefore, the benefit coverage is denied, reduced or terminated in whole or in part." [*Id.*]. In response to Mr. Falvey's second insurance payment demand, he was told to "litigate the matter in court." [Doc. No. 1-1 at ¶ 114].

Defendants argue that Plaintiff does not allege any Adverse Determination that "would relate to any service or treatment being deemed experimental, investigational, or the like, or any other finding by Defendants as to the care Plaintiff received." [Doc. No. 52 at 18]. However, I cannot agree with Defendants that Plaintiff has not, as a matter of law, pled an Adverse Determination. Defendants' brief states that "Plaintiff concedes that he communicated with Blue Star's Vice President of Operations in August 2023 regarding the Defendants' *determination* of his claim." [Doc. No. 52 at 19 (emphasis added)]. A "determination" that directs Plaintiff to "litigate the matter in court" may be fairly considered as adverse. If Defendants were permitted to evade a grievance procedure by simply failing to outline details for denying an insured's request for payment, then no insured person would be able to properly file a grievance.

Further, Plaintiff's pleadings demonstrate that he attempted to utilize the grievance procedures as outlined in the Policy, was discouraged from utilizing those procedures, the phone number provided to contact the grievance representative was inactive, and Plaintiff received no assistance in gaining updated contact information. [Doc. No. 1-1 at ¶¶ 123, 132–134, 139–143].

Plaintiff has further alleged that this conduct "worsened [Plaintiff's] injuries, inflicted injury, blocked treatment/recovery, inflicted financial loss, and caused unnecessary pain and suffering." [*Id.* at ¶ 120]. He has adequately pled harm caused by these alleged violations sufficient to survive a judgment on the pleadings.

Accordingly, Plaintiff's claim to the extent that Defendants "[m]isrepresent[ed] pertinent facts or insurance policy provisions" and "[f]ail[ed] to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies," survives judgment on the pleadings. M.G.L. c. 176D, §3(9)(a), (b). Defendants' Motion as to Counts 9, 10, 12, and 13 is denied. However, Count 11 impermissibly alleges a violation of Chapter 176D, § 3(10), for which there is no private cause of action. As such, Defendants' Motion as to Count 11 is granted.

### D.    Counts 17-19: Deceptive Business Name Practices

As in Count 11, Counts 17 and 18 must also be dismissed as they impermissibly allege violations of Chapter 176D, § 3(1) and (2), for which there is no private cause of action. As to Counts 17 and 18, Defendants' Motion is granted.

Count 19, against U.S. Fire, alleges a violation of M.G.L. c. 110, § 4B, which prohibits a company from using, "in the corporate or trade name thereof . . . any word or phrase which may lead the public to believe that the seller or his or its place of business is owned, operated or managed by the United States government or any agency thereof." Plaintiff alleges that U.S. Fire's "name is confusing" and that "[t]he company is not a part of the United States Government" and is therefore in violation of Chapter 110. [Doc. No. 1-1 at ¶¶ 189, 203]. However, putting aside whether U.S. Fire even falls within the purview of Chapter 110, [*see* Doc. No. 52 at 26], Plaintiff pleads no concrete injury resulting from this alleged violation that is

redressable by this court, and therefore lacks standing to bring this claim. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (To prove standing, Plaintiff needs to show that he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision"); [*see also* Doc. No. 52 at 24–26]. Thus, as to Count 19, Defendants' Motion is granted.

###### E.     Count 21: Failure to Provide Record of Independent Medical Evaluations

Count 21 of Plaintiff's Complaint alleges that Defendants intentionally deceived him by withholding records of non-treatment expenses that were costs borne by Defendants. [Doc. No. 1-1 at ¶¶ 216–222]. Specifically, Plaintiff contends that because "Defendants allocated more on potential benefit ending Non-treatment" than they did on "actual treatment," Plaintiff's "demands for Pain and Suffering were understated and offers received were unreasonably low." [*Id.* at ¶¶ 221–222]. I agree with Defendants that Plaintiff does not allege any plausible facts supporting its contentions of "intentional deception" by Defendants here. [*Id.* at ¶ 223; *see* Doc. No. 52 at 19-20]. Under the Policy, Defendants are entitled to bear the cost of their own independent evaluation of an insured's injury and basis of their claim. [*See* Doc. No. 24-1 at 23]. The fact that those expenses may have exceeded medical payments paid out of the policy thus far does not plausibly support an allegation of intentional deception. Further, Plaintiff does not provide other facts connecting expenses of non-treatment to the potential demand Plaintiff could have made for pain and suffering. Accordingly, Defendants' Motion as to Count 21 is granted.

###### F.     Counts 24-26: Breach of Contract and Negligent Claims

Defendants' Motion as to Count 24 for breach of contract, Count 25 for negligence, and Count 26 for negligent infliction of emotional distress, is granted. Although this Court liberally construes Plaintiff's pleadings because he is proceeding pro se, *see Haines*, 404 U.S. at 520–21,

these claims are subject to dismissal because the Complaint does not "comply[] with procedural and substantive law." *Ahmed v. Rosenblatt*, 118 F.3d 886, 890 (1st Cir. 1997). "The policy behind affording pro se plaintiffs liberal interpretation is that if they present sufficient facts, the court may intuit the correct cause of action, even if it was imperfectly pled. This is distinct from the case at hand, in which the formal elements of the claim were stated without the requisite supporting facts." *Id.*

As to Count 24, Plaintiff alleges in a conclusory fashion that "Defendants have breached the Contract by failing to perform their contractual obligations," and that such breach "worsened [Plaintiff's] injuries, inflicted injury, blocked treatment/recovery, inflicted financial loss, and caused unnecessary pain and suffering." [Doc. No. 1-1 at ¶¶ 241–242]. "For a breach-of-contract claim to survive a motion to dismiss under Massachusetts law, a plaintiff must do more than allege, in conclusory fashion, that the defendant breached the contract; rather, he must describe, with substantial certainty the specific contractual promise the defendant failed to keep." *Alenci v. Hometown Am. Mgmt.*, LLC, 2020 WL 2515872, at *4 (D. Mass. May 15, 2020) (citation omitted). Plaintiff's allegations are insufficient to state a claim for breach of contract. In any event, Count 24 is duplicative of Count 23, [Doc. No. 1-1 at ¶¶ 232–238], which asserts a claim for breach of contract for Defendants' failure to pay benefits according to the Policy, upon which Defendants do not move for judgment on the pleadings.

As to Count 25, Plaintiff similarly fails to plead non-conclusory facts to support a negligence claim. [Doc. No. 1-1 at ¶¶ 245–248]; *see Iqbal*, 556 U.S. at 687 ("Rule 8 does not empower respondent to plead the bare elements of his cause of action, affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss"); *Maldonado v. Fontanes*, 568 F.3d 263, 268 (1st Cir. 2009) ("Threadbare recitals of the elements of a cause of action,

20

supported by mere conclusory statements, do not suffice"). Merely restating the elements of a

negligence claim does not suffice for Plaintiff to survive judgment on the pleadings.

As to Count 26, Plaintiff alleges that Defendants asserted a subrogation right to funds that

Plaintiff recovered from another insurance company. [Doc. No. 1-1 at ¶ 251]. Plaintiff alleges

that because subrogation rights continue after death, that if Plaintiff "dies for unrelated reasons,

insurance is positioned to make a profit on [Plaintiff's] death," and "[p]ositioning to profit on

[Plaintiff's] death has inflicted emotional distress." [*Id.* at ¶¶ 251–260]. Plaintiff has not put forth

any facts to support this speculative and hypothetical allegation. Putting aside the implausibility

of the claim, Plaintiff has also not pled the elements of a negligent infliction of emotional

distress claim, which requires a showing of: "1) negligence; 2) emotional distress; 3) causation;

4) physical harm manifested by objective symptomatology; and 5) that a reasonable person

would have suffered emotional distress under the circumstances of the case." *Lockwood v.

Madeiros*, No. 4:18-cv-40143, 2018 WL 4087938, at *8 (D. Mass. Aug. 27, 2018) (citation

omitted). For these reasons, Defendants' Motion is also granted as to Count 26.

## V.   CONCLUSION

As explained above, Defendants' Motion for Partial Judgment on the Pleadings, [Doc.

No. 51], is granted in part and denied in part. Specifically, the Motion is <u>DENIED</u> as to Counts

1-4, 7, 9-10, 12-13 and <u>GRANTED</u> as to Counts 8, 11, 17-19, 21, 24-26. Discovery may now

commence as to the remaining counts in the complaint.


SO ORDERED.

                                          /s/ Myong J. Joun
                                          United States District Judge